## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Stacey Bush,

                                        Plaintiff,

                                                        Civ. No. 06-1110 (RHK/AJB)
                                                        **MEMORANDUM OPINION**
                                                        **AND ORDER**

v.

Penske Truck Leasing Co., LP,
Penske Logistics,

                                        Defendants.

Mark V. Steffenson, Erin R. Schulte, Henningson & Snoxell, Ltd., Maple Grove, Minnesota, for Plaintiff.

Andrew J. Voss, Jacy Rubin Grais, Jodie F. Friedman, Littler Mendelson, PC, Minneapolis, Minnesota, for Defendants.

### INTRODUCTION

In this action, Plaintiff Stacey Bush has sued her former employer, Penske Logistics, and Penske Truck Leasing Co., LP (collectively, "Penske"), for sexual harassment and retaliation in violation of the Minnesota Human Rights Act.[1]  Penske now moves for summary judgment on each of Bush's claims.  For the reasons set forth below, the Court will grant Penske's Motion.

---

[1] In her Complaint, Bush has also alleged state-law claims of assault, battery, negligence, and negligent infliction of emotional distress.  (Compl. ¶¶ 31-46.)  Bush, however, has expressly abandoned these claims, and they will be dismissed.  (Mem. in Opp'n at 31.)

# BACKGROUND

## I.  Bush's Employment with Penske

Penske provides leasing and truck-rental services for individuals and businesses. (Mem. in Supp. at 2; Berkel Dep. Tr. at 4-7.)  In December 1999, Penske hired Bush as a Local Distribution Center transportation clerk ("LDC clerk") working in its Roseville, Minnesota facility (the "Roseville facility").  (Bush Dep. Tr. at 16-20, 28.)  As an LDC clerk, Bush was responsible for scheduling and routing Penske's truck drivers to distribute the products of Penske's corporate clients.  (Id. at 19, 23-27.)

In June 2001, Bush resigned her position voluntarily.  (Id. at 21, 86; Id. Ex. 9.)  In August 2001, she was rehired in the same position.  (Id. at 89, 100; Id. Ex. 10.)  She remained with Penske until March 15, 2005, when she quit.[2]  (Id. at 186-87.)

At the core of the instant dispute are several events that occurred during the final months of Bush's employment in which she alleges that she was sexually harassed by Jeff Berkel, her supervisor and the head of the Roseville facility.[3]  Among these events is Bush's assertion that Berkel "taunted" her with a pornographic picture that she had found at work.  (Id. at 160.)  Specifically, she asserts that "probably less than two weeks before [she]

---

[2] As set forth below, Bush claims that she was constructively discharged.  (Mem. in Opp'n at 28-31.)

[3] The specific events comprising Berkel's alleged harassment are set forth in detail in Bush's Memorandum in Opposition to the instant Motion.  (See Mem. in Opp'n at 4-8.)  These events, however, are not relevant to the Court's resolution of Bush's sexual harassment claim because Penske has satisfied the elements of the Faragher-Ellerth defense.  Therefore, the Court will only set forth the events comprising Berkel's alleged harassment that are relevant to Bush's claim for retaliation.

quit" or "[a] week before she quit" she found the picture, brought it to Berkel, told him it was "highly offensive," and requested that he "find out whoever" brought it to the facility. (Id.) Berkel questioned the individual who Bush believed owned the picture and, when that individual denied owning it, Berkel put the picture on his computer. (Berkel Dep. Tr. at 54-56.) Thereafter, whenever Bush entered Berkel's office to ask him for help with her work, she asserts that he would pick up the picture and hold it in front of her face. (Bush Dep. Tr. at 160)

Throughout the period in which Bush alleges that she was sexually harassed, she states that she told Berkel that she did not "appreciate the way [he was] treating [her]" and asked him to "leave her alone." (Id. at 134, 150.) She did not, however, report Berkel's conduct to anyone else at Penske. (Id. at 134, 150-51.)

On March 14, 2005, Bush left work early to care for her child, who had become sick while at school. (Id. at 184.) The following day, she called Berkel to tell him that she was unable to come to work because her child was still sick. (Id. at 185.) During that conversation, Berkel became angry and told Bush that she "better fucking be here tomorrow." (Id.) When Bush said that she would return to work if her child was better, Berkel told her to "fuck off" and hung up on her. (Id.) Following this conversation, Bush did not return to work because she "was tired of the sexual harassment" from Berkel. (Id. at 187.) She did not inform Berkel or Penske of her decision to quit. (Id. at 186.)

## II.     Penske's Sexual Harassment Policy

3

During Bush's employment, Penske maintained a policy against sexual harassment. In May 2002, several months into her second period of employment with the company, Penske provided her with its Handbook for Non-Union Associates (the "Handbook"), which she agreed to read.  (Id. Exs. 15, 16.)  The Handbook states, in pertinent part:

> [Penske is] committed to providing a work environment that is free of discrimination. [Penske maintains] a strict policy prohibiting unlawful harassment in any form, including sexual harassment.  This includes harassment in any form including verbal, physical, visual or sexual conduct.
>
> If you believe you have been harassed by a co-worker, supervisor, agent of the employer, vendor or customer, you should promptly report the facts of the incident or incidents and the names of the individuals involved to your Supervisor and/or a Representative of the Human Resources Department.

(Id. Ex. 16 at 41.)

Penske's Roseville facility did not have any human-resources personnel on site to receive potential harassment complaints.  (Bush Dep. Tr. at 95.)  Instead, Berkel posted the name and telephone number of the Roseville facility's human-resources representative on a bulletin board outside his office.  (Id. at 95-97.)  Also, Penske employees from other locations, including human-resources employees, would periodically visit the Roseville facility.  (Id. at 44; Berkel Dep. Tr. at 29.)

On February 26, 2006, Bush brought the instant action against Penske in Minnesota state court; Penske removed the action to this court and now moves for summary judgment.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Cattrett</u>, 477

U.S. 317, 322-23 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50  (1986).

The moving party bears the burden of showing that the material facts in the case are

undisputed.  <u>See</u> <u>Celotex</u>, 477 U.S. at 322; <u>Mems v. City of St. Paul Dep't of Fire & Safety

Servs.</u>, 224 F.3d 735, 738 (8th Cir. 2000).  The court must view the evidence, and the

inferences that may be reasonably drawn from it, in the light most favorable to the non-

moving party.  <u>See</u> <u>Graves v. Ark. Dep't of Fin. & Admin.</u>, 229 F.3d 721, 723 (8th Cir.

2000); <u>Calvit v. Minneapolis Pub. Schs.</u>, 122 F.3d 1112, 1116 (8th Cir. 1997).  The non-

moving party may not rest on mere allegations or denials, but must show through the

presentation of admissible evidence that specific facts exist creating a genuine issue for

trial.  <u>See</u> <u>Anderson</u>, 477 U.S. at 256; <u>Krenik v. County of Le Sueur</u>, 47 F.3d 953, 957 (8th

Cir. 1995).

## ANALYSIS

### I.     Bush's Claim of Sexual Harassment

In her first claim for relief, Bush asserts that Berkel's conduct toward her during her final months of employment with Penske constituted sexual harassment under the MHRA because it created a hostile work environment.  (Mem. in Opp'n at 14.)  The MHRA prohibits employers from discriminating "against a person with respect to hiring, tenure, compensation . . . or privileges of employment" because of sex.  Minn. Stat. § 363A.08, subd. 2(c).  Sexual harassment is a form of sex discrimination prohibited by the MHRA.  Id. § 363A.03, subd. 13.  For purposes of the MHRA, sexual harassment "includes unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature when . . . that conduct or communication has the purpose or effect of substantially interfering with an individual's employment . . . or creating an intimidating, hostile, or offensive employment . . . environment." Id. § 363A.03, subd. 43.

To establish a *prima facie* case on a hostile-work-environment sexual-harassment claim, an employee must show: (1) membership in a protected group, (2) unwelcome harassment, (3) based on sex, (4) that affected a term, condition, or privilege of her employment.  Johnson v. Ramsey County, 424 N.W.2d 800, 808 (Minn. 1988).  The employer will be liable for the sexual harassment of an employee if the employer had knowledge or imputed knowledge of the harassment.  Id.

### A.     Burden of Proof to Establish Penske's Knowledge

One issue that has arisen in sexual harassment cases is whether the plaintiff or the defendant bears the burden of establishing whether the employer knew of sexual harassment perpetrated by the plaintiff's supervisor. Prior to 1997, Minnesota courts had held that the burden of proving that the employer "knows or should know" of the alleged harassment rested with an MHRA plaintiff. Cummings v. Koehnen, 568 N.W.2d 418, 424 (Minn. 1997); Continental Can Co. v. Minn., 297 N.W.2d 241, 249 (Minn. 1980). In 1998, the United States Supreme Court set forth a different standard under Title VII. Under that standard, knowledge of a supervisor's sexually harassing conduct is automatically imputed to the employer unless it can show that: (a) it (the employer) exercised reasonable care to prevent and promptly correct sexual harassment, and (b) the employee unreasonably failed to take advantage of the preventive or corrective measures provided. Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

Here, Bush asserts that, in light of the holdings in Faragher and Ellerth, knowledge of Berkel's conduct is imputed to Penske unless it establishes the elements of the Faragher-Ellerth defense. (Mem. in Opp'n at 21.) Penske argues, however, that the burden remains with Bush to establish that it "knew or should have known" of Berkel's alleged harassment. (Reply Mem. at 4.) In support of this argument, Penske points to the Eighth Circuit's decision in Todd v. Ortho Biotech, Inc., 175 F.3d 595, 599 (8th Cir. 1999). Todd declined to apply Faragher and Ellerth to a sexual-harassment claim under the MHRA, because the statute's definition of sexual harassment included language that the employer

7

"knows or should know" of the harassment – language which is not present in Title VII's definition of sexual harassment.  Accordingly, <u>Todd</u> concluded that Minnesota courts would place the burden on the employee to establish that the employer knew or should have known of the alleged harassment.  <u>Id.</u>

Penske's reliance on <u>Todd</u>, however, is misplaced.  Following that decision, the Minnesota legislature amended the MHRA's definition of sexual harassment to remove the language requiring that the employer "knows or should know" of the harassment.  Hence, the definition of sexual harassment in the MHRA is now nearly identical to the definition of sexual harassment in Title VII.  <u>Compare</u> Minn. Stat. § 363A.03 subd. 43 <u>with</u> 29 C.F.R. § 1604.11(a).  Because of this change, and the similarities it created between the language of Title VII and the MHRA, the Court believes that <u>Todd</u> no longer applies, and that Minnesota courts would apply the standard set forth in <u>Faragher</u> and <u>Ellerth</u> to Bush's claim.  <u>See</u> <u>Sigurdson v. Isanti County</u>, 386 N.W.2d 715, 719 (Minn. 1986)  ("[i]n analyzing cases under the [MHRA] we have often applied principles developed in the adjudication of claims arising under Title VII . . . *because of the substantial similarities between the two statutes*") (emphasis added); <u>see</u> <u>also</u> <u>Dauer v. Elo Eng'g, Inc.</u>, No. C5-98-1857, 1999 WL 319087, at *2 n.2 (Minn. Ct. App. May 18, 1999) (noting that court's decision in sexual-harassment claim under MHRA coincides with standard set forth in <u>Fargher</u> and <u>Ellerth</u>); <u>Anderson v. Crossroads Capital Partners, L.L.C.</u>, Civ. No. 01-2000, 2004 WL 256512, at *5-6 (D. Minn. Feb. 10, 2004) (applying <u>Faragher</u> and <u>Ellerth</u> to MHRA claim for sexual harassment).

8

**B.      Penske's Use of the <u>Faragher-Ellerth</u> Defense**

In the instant case, the Court assumes *arguendo* that Bush has established a *prima facie* case of sexual harassment.  Her claim nevertheless fails because Penske has fulfilled its burden of establishing the elements of the <u>Faragher-Ellerth</u> defense.  <u>Cf.</u> <u>Twymon v. Wells Fargo & Co.</u>, 462 F.3d 925, 935 (8th Cir. 2006) (court may assume, without deciding, that the plaintiff has established a *prima facie* case of discrimination, and move on to consider later stages of analysis).

**1.      Penske's Reasonable Measures to Prevent Harassment**

Penske argues that it took reasonable measures to prevent and promptly correct sexual harassment by maintaining a policy prohibiting such conduct and directing employees to contact a human-resources representative if they believed they had been the victim of such conduct.  (Mem. in Supp. at 19.)  In determining whether Penske's actions are sufficient to establish such reasonable care, the Court finds instructive the recent holding in <u>Gordon v. Shafer Contracting Co.</u>, 469 F.3d 1191 (8th Cir. 2006).[4]  In that case, plaintiff Gordon sued his employer, Shafer, for a hostile work environment because of several racially-offensive comments allegedly made by his supervisor.  <u>Id.</u> at 1195.  In holding that Shafer had established a <u>Faragher-Ellerth</u> defense for the claim, the Court stated that:

─────────────────────

[4] <u>Gordon</u> was not cited by the parties in their summary judgment papers and was called to counsels' attention by the Court during oral argument.  Thereafter, the parties addressed the applicability of <u>Gordon</u> to the instant case in supplemental memoranda requested by the Court.

> Shafer publishes an Employee Policy Manual ("Manual") that describes its anti-discrimination policies and reporting procedures, including a policy against harassment . . . . Gordon acknowledges receiving the policy . . . . The Manual identifies three company officials to whom harassment can be reported and provides their work and home telephone numbers.  Gordon never reported  the alleged harassment to any of these officials . . . . We affirm the district court's holding that Shafer established the [Faragher-Ellerth] defense . . . .

Id. at 1195.

Penske's actions in the instant case closely resemble what the Eighth Circuit held was reasonable to prevent harassment in Gordon.  Penske's Handbook, which was provided to Bush, clearly states that Penske "maintain[s] a strict policy prohibiting unlawful harassment in any form, including sexual harassment."  (Bush Dep. Ex. 16 at 41.)  It also provides employees who believe they are victims of sexual harassment with multiple reporting options.  Specifically, an employee may report sexual harassment to either his or her supervisor or a representative of Penske's Human Resources Department.  (Id.)  Finally, the phone number of Penske's human-resources officer for the Roseville facility was posted for employees on a bulletin board outside of Berkel's office.  (Bush Dep. Tr. at 95-97).  Based on these facts, the Court determines that Penske exercised reasonable care in preventing sexual harassment.

Bush argues, however, that Penske's anti-harassment policy is insufficient to establish reasonable care because it does not have a "mandatory" reporting requirement.  (Mem. in Opp'n at 21-22.)  In support of this argument, Bush relies on Kay v. Peter Motor Co., Inc., 483 N.W.2d 481, 484 (Minn. Ct. App. 1992).  In that case, plaintiff Kay sued her employer, Peter Motor Co. ("Peter"), for sexual harassment by her supervisor.  Id. at 483.

Peter argued that it was not liable for the conduct of Kay's supervisor because she had not

reported it to the company.  Id. at 484.  In upholding the trial court's determination that

Peter was liable for sexual harassment, the Minnesota Court of Appeals stated that "[n]o

reported case has required a report [of harassment to the employer] where the employer's

grievance procedures do not outline a mandatory complaint procedure."  Id.

  Bush's reliance on Kay is misplaced for two reasons.  First, unlike the instant case,

the employer in Kay had "no express grievance reporting procedure and no policy for

reporting wrongful harassment."  Id.  Therefore, the issue in Kay was not whether the

employee was *required* to report harassment, but whether the employee had an outlet to

report such behavior at all.  When an employer does have an available reporting procedure

in place for its employees, Minnesota courts have determined that a victim of sexual

harassment has a duty to follow that procedure to preserve a claim of sexual harassment.

See Weaver v. Minn. Valley Lab. Inc., 470 N.W.2d 131, 135 (Minn. App. 1991).

Therefore, because Penske's policy provided a procedure for reporting sexual harassment

to the Human Resources Department, Bush was obligated to follow that procedure in order

to maintain a claim of sexual harassment; she failed to do so.

  Second, Kay was decided several years before Faragher and Ellerth.  Therefore, in

Kay, the issue of whether the employer had taken reasonable care to prevent harassment

was not presented to the court because, at the time, Minnesota courts required the plaintiff

in a sexual harassment case to prove that the employer "knew or should have known" of the

harassment.  Under the Faragher-Ellerth defense, "mandatory" reporting is not required for

an employer to establish that it exercised reasonable care to prevent harassment, so long as

the employer provides employees with multiple individuals to whom they may report their

harassment.  See Williams v. Mo. Dept. of Mental Health, 407 F.3d 972, 976-77 (8th Cir.

2005) (rejecting argument that employers anti-discrimination policy was unreasonable

because it lacked mandatory reporting).  As stated above, Penske provided Bush with

multiple reporting options.  Accordingly, Bush's argument that Penske's sexual-harassment

policy is insufficient to establish reasonable care fails.

## 2.     Penske Effectively Disseminated its Policy

Bush next argues that, even if Penske's harassment policy is sufficient to establish

that it acted with reasonable care, Penske is still responsible for Berkel's conduct because

it did not effectively *disseminate* its policy to its employees.  (Mem. in Opp'n at 23-25.)

An employer's failure to disseminate its anti-harassment policy is an important

consideration in determining whether the employer took reasonable care to prevent

harassment.  See Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1298 (11th Cir.

2000) (citing Faragher, 524 U.S. at 808).  In support of her argument that Penske did not

disseminate its policy, Bush asserts that the policy was contained in the back of the

Handbook and that the Handbook was simply "given" to her with "no accompanying

identification of the policy's existence."  (Mem. in Opp'n at 25.)

Under the facts of this case, the Court determines that Penske did effectively disseminate its policy to Bush. Despite Bush's arguments to the contrary, the fact that the policy was located at the back of the Handbook does not mean that it was inaccessible to her. In its entirety, the Handbook was 43 pages in length; the Court is wary of Bush's implicit argument that it was unreasonable for Penske to ask her to become familiar with such a short document. (See Bush Dep. Ex. 15.) More importantly, however, the Handbook's table of contents provides the specific page where Penske's policy on harassment may be found. (Id. at 2.) Accordingly, Bush's argument that the policy was somehow hidden from her in a voluminous document fails. See Speaks v. City of Lakeland, 315 F. Supp. 2d 1217, 1227 (M.D. Fla. 2004) (argument that sexual harassment policy was not effectively disseminated because it was "buried" in personnel manual ineffective when table of contents explicitly listed page in which policy was located).

The Court also finds unpersuasive Bush's argument that Penske failed to effectively disseminate its policy because the Handbook was "given" to her without specifically identifying the policy. Rather than simply "giving" her the Handbook, as Bush suggests, Penske required Bush to sign an acknowledgment of receipt in which she "agreed to read and familiarize" herself with the Handbook's contents. (Bush Dep. Ex. 15.) By agreeing to familiarize herself with the Handbook, Bush had constructive knowledge of its contents, including Penske's sexual-harassment policy. Shaw v. Autozone, Inc., 180 F.3d 806, 811 (7th Cir. 1999) (employee had constructive notice of contents of anti-discrimination policy when she received it and signed acknowledgment stating she would read it).

13

Accordingly, Bush has not established that Penske failed to effectively disseminate its

policy against sexual harassment.

For the reasons set forth above, the Court concludes that Penske has fulfilled the

first element of the <u>Faragher-Ellerth</u> defense – that it exercised reasonable care to prevent

sexual harassment – when it provided Bush with its sexual harassment policy.

### 3.     Bush's Failure to Report Berkel's Conduct

Bush does not dispute that she failed to report Berkel's conduct to Penske's Human

Resources Department.  She asserts, however, that her failure to do so was reasonable

because she did not believe Penske would respond to her report and because she feared that

Berkel would retaliate against her.[5]  (Mem. in Opp'n at 28.)  Bush, however, provides no

evidence, other than her own subjective belief, to support the conclusion that Penske would

not have responded if she had reported Berkel's conduct.  For example, when asked whether

her interactions with Penske's Human Resources Department provided her with any reason

to suspect that Penske would act on her report, Bush responded: "I didn't think they would.

I believed that they would not take my – that's all, that I did not believe that they would do

anything . . .".  (Bush Dep. Tr. at 175.)  When asked to further explain *why* she held this

---

[5] In her deposition, Bush also asserts that she failed to report Berkel's conduct because she
was "ashamed" of herself because of the alleged harassment.  (Bush Dep. Tr. at 180.)  Bush, however,
does not rely on this testimony in her submissions to the Court.  Regardless, Bush's personal feeling of
shame is insufficient to provide a reasonable basis for her failure to report Berkel's conduct pursuant to
Penske's policy.  <u>Williams</u>, 407 F.3d at 977 (employees' feelings of "shame, shock, and humiliation"
do not provide reasonable basis for failure to alert employer of supervisor's sexual harassment).

belief, Bush responded: "I just believe it." (Id.) Bush's subjective belief, without evidentiary support, does not provide a reasonable basis for her failure to report Berkel's conduct pursuant to Penske's policy.

Bush's assertion that she failed to report Berkel's conduct for fear of retaliation is similarly unavailing. In support of this assertion, Bush alleges that, two years earlier, Berkel retaliated against two of her co-workers, Stan Klein and Stan Svertka, when they reported safety concerns at the Roseville facility. (Id.; Bush Dep. Tr. at 45, 48, 50, 178-80.) These allegations, however, do not provide a reasonable basis for Bush's failure to report Berkel's conduct pursuant to Penske's sexual-harassment policy.

First, Bush had no reasonable basis to conclude that, had she wished to keep it confidential, Penske would have informed Berkel that she had reported his conduct. In an effort to demonstrate that she believed Penske would have informed Berkel of such a report, Bush points to the fact that Berkel knew of Klein's safety complaint two years earlier. (Mem. in Opp'n at 29.) She does not, however, provide evidence that, at the time he filed his safety complaint with Penske, Klein attempted to prevent Berkel from knowing of it or keep it confidential in any way. Moreover, Bush has not provided evidence or explained her apparent belief that Penske treated safety complaints in the same manner that it treated sexual harassment complaints.

Second, Berkel's actions against Klein and Svertka, if true, do not provide a reasonable basis for Bush's failure to report his conduct. Bush alleges that, in response to

their safety reports, Berkel assigned Klein and Svertka "hard work" that they "didn't like" and refused to provide them with an assistant.  (Bush Dep. Tr. at 48, 50, 59.)  These minor annoyances in the workplace simply do not rise to the level of retaliation sufficient to prevent a reasonable person from reporting a claim of sexual harassment.  Cf. Burlington N. & Santa Fe Ry. Co. v. White, __ U.S. __, 126 S. Ct. 2405, 2415 (2006) ("normally petty slights, minor annoyances, and simple lack of good manners" will not dissuade a reasonable person from pursuing a claim of retaliation).  Accordingly, the Court determines that Bush's failure to report Berkel's conduct pursuant to Penske's sexual harassment policy was unreasonable.

Because the Court determines that Penske has fulfilled both elements of the affirmative defense set forth in Faragher and Ellerth, it will grant Penske's motion for summary judgment on Bush's sexual harassment claim.

## II.     Bush's Retaliation Claim

In her second claim for relief, Bush asserts that Berkel retaliated against her by waving in her face the pornographic picture she had found after she told him it was offensive to her.  (Bush Dep. Tr. at 188-90.)  The MHRA prohibits an employer that has engaged in an unfair discriminatory practice from retaliating against an individual who opposed its prohibited practice.  See Minn. Stat. § 363A.15.  Because Bush presents no direct evidence of retaliation, the familiar McDonnell Douglas burden-shifting framework governs the order and analysis of proof for her claims.  Kasper v. Federated Mut. Ins. Co.,

16

425 F.3d 496, 502 (8th Cir. 2005); Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101

(Minn. 1999) (stating MHRA retaliation claims are analyzed in the same fashion as Title

VII retaliation claims.)  Under this analysis, the plaintiff bears the initial burden of

establishing a *prima-facie* case of retaliation.  McDonnell Douglas Corp. v. Green, 411

U.S. 792, 802 (1973).  After the plaintiff has met this burden, the defendant must then

articulate a legitimate, nondiscriminatory reason for its action.  Id.  Finally, the burden

shifts back to the plaintiff to establish that the defendant's proffered nondiscriminatory

reason was pretext.  Id. at 804.

Penske argues that Bush has failed to establish a *prima facie* case of retaliation.

(Mem. in Supp. at 21-22.)  To establish a *prima facie* case of retaliation under the MHRA,

an employee must show: (1) statutorily-protected conduct by the employee; (2) an adverse

action by the employer; and (3) a causal connection between the two.  Fletcher, 589

N.W.2d at 101-02 (citation omitted).

In the instant case, the parties do not dispute that Bush was engaged in protected

conduct when she brought Berkel the pornographic picture that she had found and told him

that she thought it was offensive.  Penske argues, however, that Bush has not shown that she

suffered an adverse employment action as a result of this incident.  To establish an adverse

employment action for purposes of a retaliation claim, an employer "must show that a

reasonable employee would have found the challenged actions materially adverse."

Burlington, 126 S. Ct. at 2415.  In other words, the employer's conduct must be

sufficiently severe that it "well might have dissuaded a reasonable worker from" engaging in his or her protected conduct.  Id. (internal quotations omitted).

Bush argues that she has established an adverse employment action for purposes of her retaliation claim because, after she brought the pornographic picture to Berkel's attention, she was constructively discharged.  (Mem. in Opp'n at 28-31.)  In support of this claim, Bush asserts that after she brought the picture to Berkel, he laughed at her and repeatedly waved it in front of her face.  (Bush Dep. Tr. at 190.)

Constructive discharge occurs "when an employer deliberately renders the employee's working conditions intolerable and thus forces [her] to quit [her] job." Thompson v. Bi-State Dev. Agency, 463 F.3d 821, 825 (8th Cir. 2006) (quoting Smith v. World Ins. Co., 38 F.3d 1456, 1460 (8th Cir. 1994)).  An employee, however, "may not be unreasonably sensitive to [her] working environment."  West v. Marion Merrell Dow, Inc., 54 F.3d 493, 497 (8th Cir. 1995) (citation omitted, alteration in original).  "Part of an employee's obligation to be *reasonable* is an obligation not to assume the worst and jump to conclusions too fast."  Id. at 498 (citation omitted, emphasis in original).  Accordingly, "[a]n employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged."  Id.

In the instant case, even if the Court were to assume that Berkel's actions of waving the pornographic picture in front of Bush's face was sufficiently severe to render her working conditions "intolerable," Bush's claim that she was constructively discharged fails

because she did not to provide Penske with a reasonable opportunity to correct the problem. As stated above, Bush was provided with multiple channels in which she could have reported Berkel's conduct to Penske officials. Despite this opportunity, she did not report that Berkel held an offensive picture in front of her face despite her protests. Instead, her only attempt to stop Berkel's actions was telling him that she "[did not] like" it. (Bush Dep. Tr. at 160.) By not reporting that Berkel was periodically waving an offensive picture in front of her face to Penske officials, Bush did not provide Penske with a reasonable opportunity to address the problem.

In a last-ditch effort to save her claim, Bush re-asserts her argument that her failure to report Berkel's conduct was reasonable because of Berkel's prior "retaliation" against Klein and Svertka. For the reasons set forth above, however, the Court determines that Berkel's previous actions against Klein and Svertka do not provide a reasonable basis for Bush's failure to report Berkel's actions to Penske.

Because Bush did not present Penske with a reasonable opportunity to correct Berkel's alleged retaliatory conduct toward her, the Court determines that she was not constructively discharged. Bush does not argue that she suffered any other adverse employment action in retaliation for engaging in protected conduct. Accordingly, the Court determines that Bush has failed to present sufficient evidence from which a reasonable jury could conclude that Penske retaliated against her.

**CONCLUSION**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**ORDERED** that Penske's Motion for Summary Judgment (Doc. No. 13) is **GRANTED**

and Plaintiff Stacey Bush's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

      **LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: May __4__, 2007                s/Richard H. Kyle
                                         RICHARD H. KYLE
                                         United States District Judge